### PROVIDENCE & W. R. CO. v. UNITED STATES (two cases).

### SAME v. PAGE, Collector of Internal Revenue.

### Nos. 1881, 1980, 1981.

District Court, D. Rhode Island.
Dec. 15, 1930.

Eugene J. Phillips, of Providence, R. I., and Brewster & Ivins, of Washington, D. C., for plaintiff.

Henry M. Boss, Jr., U. S. Atty., of Providence, R. I., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and L. A. Norman, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for defendants.

LETTS, District Judge.

The above-named causes of action are for the refund of income and profits taxes, together with interest. All involve substantially the same issues and were heard together by stipulation between the parties; trial by jury in each case being waived. The cases relate to taxes paid by the plaintiff for the following years or portions thereof: Docket No. 1881, calendar year 1918; docket No. 1980, calendar year 1919; docket No. 1981, calendar year 1920.

The question presented is whether the rate of income tax on the income of the plaintiff company should be 12 per cent. or 10 per cent. for the calendar year 1918, and 10 per cent. or 8 per cent. for the calendar year 1919 and the period of January and February of 1920. All other issues raised by the pleadings have been waived. The cases involve an interpretation and an analysis of the legal effect of certain provisions of the Revenue Act of 1918 (Act of February 24, 1919 [40 Stat. 1057]) considered in connection with the Federal Control Act of Railways of March 21, 1918 (40 Stat. 451) and a certain agreement dated April 26, 1919, between the Director General of Railroads and the New York, New Haven & Hartford Railroad Company.

The plaintiff company, a Rhode Island corporation, under date of December 17, 1892, leased all of its property, appurtenances and franchises for the term of 99 years from July 1, 1892, to the New York, New Haven & Hartford Railroad Company, which lease was in full effect during the period represented by the years to which these several suits relate. The following are the pertinent provisions of the lease so far as are involved in these suits:

"And the lessee covenants to pay as rent hereunder on the last day of each of the months of September, December, March and June, in each year during said term, a sum equal to two and one-half dollars upon each share of the capital stock of the lessor (said capital stock amounting at the date hereof to $3,500,000), said rent to be paid to the Treasurer or other designated agent of the lessor; and the lessee further covenants to pay the interest of all bonded indebtedness for the payment of which the lessor may be legally holden as the same shall from time to time mature, and to assume and pay all the other legal obligations of the lessor of every name and nature, as the same shall from time to time fall due, except the principal of the lessor's bonded indebtedness, for which provision has been hereinbefore made, and to keep and perform all and singular the contracts now in force and binding on the lessor.

"And the lessee further covenants to pay, during each year of said term, all taxes, rates, charges and assessments, ordinary and extraordinary, which may be lawfully imposed or assessed in any way upon the lessor or lessee with reference to the premises and property hereby demised, the capital stock of the lessor, its indebtedness, franchises and revenues or said rental; said payments to be made to the authority or treasurer entitled by law to receive the same, whether Federal, State or Municipal, so that the lessor shall be saved harmless, during the continuance of this lease from any tax, assessment or charge under laws or proceedings made or authorized by the United States or any state or municipality."

The provisions of the acts of Congress which are involved are as follows:

Federal Control Act, 40 Stat. 451.

"Sec. 1. That the President, having in time of war taken over the possession, use, control, and operation (called herein Federal control) of certain railroads and systems of transportation (called herein carriers), is hereby authorized to agree with and to guarantee to any such carrier making operating returns to the Interstate Commerce Commission, that during the period

of such Federal control it shall receive as just compensation an annual sum, payable from time to time in reasonable installments, for each year and pro rata for any fractional year of such Federal control, not exceeding a sum equivalent as nearly as may be to its average annual railway operating income for the three years ended June thirtieth, nineteen hundred and seventeen."

Revenue Act of 1918, 40 Stat. 1057, 1075.

"Sec. 230. (a) That, in lieu of the taxes imposed by section 10 of the Revenue Act of 1916, as amended by the Revenue Act of 1917, and by section 4 of the Revenue Act of 1917, there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax at the following rates:

"(1) For the calendar year 1918, 12 per centum of the amount of the net income in excess of the credits provided in section 236; and

"(2) For each calendar year thereafter, 10 per centum of such excess amount.

"(b) For the purposes of the Act approved March 21, 1918, entitled 'An Act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes,' five-sixths of the tax imposed by paragraph (1) of subdivision (a) and four-fifths of the tax imposed by paragraph (2) of subdivision (a) shall be treated as levied by an Act in amendment of Title I of the Revenue Act of 1917."

The railroad and transportation system of the New York, New Haven & Hartford Railroad Company was among those taken over by the government. On the 26th of April, 1919, Walker D. Hines, as Director General of Railroads, entered into an agreement, consonant with the authority vested by said section 1 of the Federal Control Act, with said corporation. Only certain provisions of this agreement are relevant to the present controversy. The more important of these are as follows:

"Sec. 1 (a) * * *

"This agreement shall not be construed as creating any right, claim, privilege, or benefit against either party hereto in favor of any state or any subdivision thereof, or of any individual or corporation other than the parties hereto. * * *

"(h) Wherever the property of the company is referred to in this agreement it shall be understood as including all the property described in paragraph (a) of section 2 hereof, whether owned by or leased to the Company, and, where the context permits, all additions or betterments thereto or extensions thereof made during Federal control; and as to all such leased property the Company shall have the benefit of and be subject to all the obligations and provisions of this agreement and shall be subject to all duties imposed by law in respect of such leased property."

Section 6 of the agreement embodies the provisions thereof relative to taxes. These provisions cannot be adequately quoted except in their entirety, and this is not practical. No agreement was entered into between the Director General and the plaintiff company, and no contract is presented in the record in any way involving or relating to the properties of the plaintiff other than the one already referred to.

The plaintiff filed a corporation income profits tax return for the calendar year 1918, showing an income and profits tax liability of $53,230.84, which sum was paid to the collector of internal revenue at Providence. A check for an amount equal to this tax was drawn by the New Haven payable to the plaintiff, who in turn indorsed the check or checks, delivering them to the collector. Afterwards the New Haven was reimbursed by the Director General of Railroads in an amount equal to the 2 per cent. normal tax of the plaintiff for said year.

Subsequently an additional tax of $20,216.82 was assessed against the plaintiff, and the New Haven to cover said assessment, delivered to the plaintiff two checks to its order, one for $19,464.50 and the other for $750.32—an error of $2 in the sums stipulated. These were in turn indorsed by the plaintiff and delivered to the collector. The smaller of the two checks was drawn by the New Haven against funds of the Director General; this action being taken in accordance with an appropriate provision of the Transportation Act of 1920 (41 Stat. 456). The action of drawing against these funds, to the amount indicated, was subsequently ratified by the Director General.

The assessment and payment of the taxes for 1919 and the first two months of 1920 was handled and carried out in manner similar to that for 1918.

As a result of these several assessments and payments, the plaintiff's taxes were computed at the rate of 12 per cent. on the income for 1918, and 10 per cent. on the income for 1919 and the first two months of 1920; the amount of the income being determined

by including therein as income for each period amounts equal to the sums paid by the New Haven to cover the taxes assessed. In other words, the taxes assessed and paid to the government, funds for the payment of which were provided by the New Haven in accordance with the terms of the lease, were treated as a part of the taxable income of the plaintiff company. There appears to be no dispute that this method of arriving at the amount of taxable income was proper and in accord with the determination of the Supreme Court in the case of United States v. Boston & Maine Railroad, 279 U. S. 732, 49 S. Ct. 505, 73 L. Ed. 929.

The question now presented is whether the plaintiff company, as the lessor of railroad properties which were leased to and operated by the New Haven, is entitled to recover back the additional 2 per cent. upon its income which was not paid during the period of federal control by the operating railroads whose facilities had been taken over.

In the case of the Appeal of the New York, Ontario & Western Railroad Co., 1 B. T. A. 1172, the United States Board of Tax Appeals recognized that carrier corporations, whose facilities had been taken over and having a contract with the Director General, were relieved under sections 1 and 12 of the Federal Control Act and the provisions of section 6 of the standard contract from paying the 2 per cent. normal tax. And in the case of Western Maryland Railway Co. v. Commissioner, 12 B. T. A. 889, the Board of Tax Appeals extended the same rule as to the 2 per cent. normal tax to carrier corporations whose property had been taken over under federal control, but with whom the standard contract had not been entered into.

There appears to have been no case heretofore passed upon by any court where the corporation, making claim to the benefit of such exemption, had leased to an operating company all of its facilities under a long-term lease; the properties so leased having been taken over under federal control from the lessee. The Commissioner of Internal Revenue, however, has refused to apply the lower rates in fixing the assessments upon such lessor railroad corporations.

The problem stated in another way is: Can the owner of a reversion in the physical properties of a railroad claim the benefit of this exemption as can an operating company?

At the outset, we find that the Director General at no time entered into a contract with the Providence & Worcester Railroad Company. It is doubtful, however, if the absence of such a contract would preclude the present claim if it appeared from the enactments of Congress that it was the intention that such lessor corporations should benefit thereunder. In this respect the decision of the Board of Tax Appeals in the case of the Western Maryland Railway Co., supra, seems justified.

It was not the intention of Congress to leave it to the Director General to discriminate between carriers whose properties were taken over, by entering into or declining to enter into the standard form of contract directly with the carrier.

The real obstacle in the way of plaintiff's claim is the difficulty of bringing the plaintiff, as a lessor and as the owner of a reversion, either within the literal or common sense interpretation of the statutes involved. Section 1 of the Federal Control Act is explicit in respect to those with whom the President is authorized to agree. From that, one would deduce that those with whom agreements are authorized are the parties intended to come within the scope of the legislation. This section refers to carriers making operating returns to the Interstate Commerce Commission. It fixes the maximum compensation which may be paid to such carrier by limiting it upon a three-year average of its "annual railway operating income." Throughout the act both clarity of expression and emphasis of repetition make clear that the legislation was intended to apply to operating carriers only.

The reports of the Senate Committee and of the House Committee on Interstate and Foreign Commerce in respect to the legislation then pending before those bodies are consistent with this view. The statute seems to present no ambiguities, however, which either necessitate or justify turning to such reports for guidance in interpretation.

The claimant lays considerable emphasis upon the argument that Congress intended the release from the liability for the 2 per cent. tax to apply to all railroad corporations whose properties were in fact taken over, and asserts that the properties of the claimant were so taken. The weakness of this argument appears to lie in a misapprehension of what the plaintiff corporation in fact owned during the period of federal control and what it was that the government took over. The company's railroad properties had been leased for a period of 99 years to the New Haven, and in substitution therefor the

company held only its right of reversion with which it had not parted, together with its rights under the lease. These property rights were not disturbed or taken over.

The ownership of property, when one speaks of complete ownership, has been likened to a bundle of straws, each straw representing a different right, and all together constituting full or complete ownership. There is the right to sell, the right to possess, the right to use, and various other rights incident to ownership. The plaintiff, after leasing its properties, had for 99 years parted with its right to use; parted with its right to possess; parted with its right to sell, except subject to the leasehold estate in the New Haven. The plaintiff was left undisturbed in full enjoyment of that which constituted its property.

It is urged by the plaintiff that to deny the lower rate of tax to the lessor company defeats in part the payment of just compensation to the lessee. It is urged also that the Director General, in assuming the payment of or releasing the New Haven from the secondary obligation of bearing the 2 per cent. normal tax paid by the plaintiff, releases also the lessor company from the primary obligation.

Both of these arguments arise from a failure to call things by their right names. It is not for us to comment upon the elastic rental provisions of the lease entered into by the New Haven. It is unescapable, however, that the variable sums paid by the lessee to the lessor are not in part rentals and in part taxes. These sums paid in toto are paid as rentals. United States v. Boston & Maine Railroad, supra.

If, as urged by the plaintiff, the lessee company is unable to get full repayment from the Director General for sums paid to the lessor to cover its increased taxes on income resulting from the 2 per cent. normal tax, and that the lessee's compensation is to that extent less than intended by the enactment of Congress and its right to just compensation, the forum to present that claim is not within the present case. If it has merit, it is to be considered in a direct, not a collateral, bearing. Nor, as I understand the situation, did the Director General in any sense release the New Haven from a secondary liability by paying to, or allowing, it sums or credits sufficient to pay the plaintiff an additional rental because of its normal tax. That course, on the part of the Director General, was the payment merely of part of the compensation to which the New Haven was entitled under the law, and analogous only to what the law would have treated as a rental had it been paid under a lease, rather than pursuant to a statute in compensation for a governmental taking.

Judgment in each of the foregoing cases may be entered for the defendant.